

**International Chamber of Commerce**

*The world business organization*

**International Court of Arbitration ● Cour internationale d'arbitrage**

# AWARD

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

**ICC International Court of Arbitration ● Cour internationale d'arbitrage de la CCI**

38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Web site www.iccarbitration.org   E-mail arb@iccwbo.org

## ICC INTERNATIONAL COURT OF ARBITRATION

### CASE No. 14 203/EBS

YUKOS CAPITAL S.A.R.L.                    (Luxembourg)

vs/

OAO SAMARANEFTEGAZ                    (Russian Federation)

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

This document is an original of the Award rendered in conformity with the Rules of the
ICC International Court of Arbitration.

ICC No. 14203/EBS – Final Award

# ICC International Court of Arbitration

### Case No. 14203/EBS

Counsel:

Ms. Victoria Orlowski
38, Cours Albert 1er
F-75008 Paris / France
Tel. +33 1 49 53 28 32
Fax +33 1 49 53 57 80
E-mail: ica5@iccwbo.org

The Arbitrators:

DR. BERNHARD F. MEYER-HAUSER
MEYER MÜLLER ECKERT PARTNER
Kreuzstrasse 42
CH-8008 Zurich / Switzerland
Tel. + 41 1 254 99 66
Fax + 41 1 254 99 60
meyer-hauser@mme-law.ch
(Chairman of the Arbitral Tribunal)

<table>
<tr><td>John J. Kerr Jr., Esq.<br>SIMPSON THACHER & BARTLETT LLP<br>425 Lexington Avenue<br>New York, NY, 10017-3954 / USA<br>Tel +12124553805<br>Fax +12124552502<br>jkerr@stblaw.com<br>(Co-Arbitrator)</td><td>Dr. Ivan Zykin<br>INSTITUTE OF STATE AND LAW, RUSSIAN<br>ACADEMY OF SCIENCES<br>10 Znamenka Street<br>119841 Moscow / Russia<br>Tel +74954492605<br>Fax +74952039226<br>zykin@b-and-l.org.ru<br>(Co-Arbitrator)</td></tr>
</table>

On 15. August 2007

<table>
<tr><td>YUKOS CAPITAL S.A.R.L.<br>1, Allée Scheffer<br>L-2520 Luxembourg / Luxembourg<br>Claimant<br>represented by</td><td>OAO SAMARANEFTEGAZ<br>Volzhsky Prospect, 50<br>RUS-443071 Samara / Russia<br>Respondent<br>acting by</td></tr>
<tr><td>Kevin Bonavia<br>Nicola Boulton, Esq.<br>BYRNE AND PARTNERS<br>77 St. John Street<br>GB-London EC1M 4NN / England<br>Tel +442071072400<br>Fax +442071072401<br>info@byrneandpartners.com</td><td>CJSC YUKOS EP<br>Mr. Y.A. Starodubtsev<br>31a Dubininskaya str.<br>RUS-Moscow 115054 / Russia<br>Tel. +74957880036<br>Fax +74957555357</td></tr>
</table>

Richard G. Menaker, Esq.
MENAKER & HERRMANN LLP
10 East 40th Street
New York, NY 10016 / USA
Tel +12125451900
Fax +12125451656
rmenaker@mhjur.com

**R. J. LOOSLEY**
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

## I.     BACKGROUND TO THE DISPUTE

1   Yukos Capital S.a.r.l. ("Claimant") is a limited liability company incorporated in Luxembourg. It is managed by TMF Corporate Services S.A. ("TMF") which acts as corporate services provider to Claimant.

2   OAO Samaraneftegaz ("Respondent") is an open joint stock company incorporated in Russia. It had transferred all powers of its executive bodies to Yukos Exploration and Production Closed Joint Stock Company / CJSC Yukos EP / ZAO Yukos EP ("Yukos EP") which acted as the management company for Respondent (see items 39 to 41 infra).

3   The Parties were both indirect subsidiaries of Yukos Oil Company. Claimant's function was to provide financing to other companies in the Yukos group. Respondent was one of the operating companies in the group.

4   In July 2004, Claimant and Respondent concluded two agreements by virtue of which Claimant undertook to grant to Respondent interest bearing loans. Based on these agreements, Claimant paid to Respondent a loan of 1,700,000,000 Russian Rubles and a loan of 715,890,000 Russian Rubles (collectively, the "Loan Agreements" or "Loans"). Respondent neither paid interest on these Loans nor repaid the principal amount of the Loans when Claimant sought repayment of the principal amounts pursuant to an acceleration clause in the Loan Agreements.

5   On 2 November 2005, the Parties signed an Addendum to each of the Loan Agreements ("Addendum" or, in the plural, "Addenda"). These Addenda defined New York law as the substantive law applicable to the Loans and subjected disputes arising out of the Loan Agreements to the Rules of Arbitration of the International Chamber of Commerce ("ICC").

## II.     PROCEDURAL CHRONOLOGY

17.01.2006   Claimant filed its Request for Arbitration with the ICC International Court of Arbitration ("ICC Court"), Paris.

20.01.2006   The ICC Court forwarded the Request for Arbitration to Respondent and invited Respondent to submit its Answer to the Request.

13.02.2006   Claimant suggested that the case be decided by a sole arbitrator instead of by three Arbitrators. Respondent did not respond to this suggestion.

22.02.2006   Claimant nominated John J. Kerr Jr., Esq. as Co-Arbitrator. Respondent did not nominate its Co-Arbitrator.

06.04.2006   Respondent (in the person of Mr. Grekhov, then President of Yukos EP) informed the ICC Court that Respondent did not acknowledge the ICC arbitration provisions in the Addenda and refused to pay the advance on costs.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
. rloosley@fasken.co.uk

| | |
|---|---|
| 24.04.2006 | Claimant provided its comments to Respondent's jurisdictional objections. |
| 05.05.2006 | The ICC Court (1) decided that this arbitration would proceed upon a *prima facie* examination pursuant to Art. 6(2) of the Rules of Arbitration of the International Chamber of Commerce ("ICC Rules"); (2) confirmed Mr. John Kerr as Co-Arbitrator; and (3) nominated Dr. Ivan Zykin as Co-Arbitrator pursuant to Art. 9(6) of the ICC Rules. |
| 12.05.2006 | Respondent (in the person of Mr. Y.A. Starodubtsev, then Acting President of Yukos EP) again objected to the ICC's jurisdiction and claimed that the dispute fell within the "object and subject competence" (jurisdiction) of the International Commercial Arbitration Court of the Russian Federation. |
| 30.06.2006 | As decided on 5 May 2006, the ICC Court continued the proceedings and appointed Dr. Bernhard F. Meyer-Hauser as Chairman of the Arbitral Tribunal. |
| 04.07.2006 | The ICC Secretariat sent the case file to the members of the Arbitral Tribunal and informed them that New York City, U.S.A., was the place of arbitration. |
| 10.07.2006 | On behalf of the Arbitral Tribunal, the Chairman notified the Parties by letter that the Terms of Reference would be established in a hearing (the "Terms of Reference Hearing") and asked the Parties (1) to advise on their availability for the hearing, and (2) to submit a summary of their respective positions to be incorporated into the Terms of Reference. |
| 17.07.2006 | During a follow-up telephone call with Respondent, the Chairman was informed that Respondent's designated representative, Mr. Grekhov, was no longer in charge of this matter and that he had been replaced by Mr. Starodubtsev. |
| 18.07.2006 | The Chairman sent another copy of his letter of 10 July 2006 to Respondent, for the attention of Mr. Starodubtsev, requesting its response. The Chairman also reminded Mr. Starodubtsev that the arbitration would proceed, on a *prima facie* basis and without prejudice to Respondent's objections to the Arbitral Tribunal's jurisdiction. Furthermore, the Chairman informed Respondent that it had a right to appoint a lawyer on its behalf, and that if Respondent failed to take part in drawing up the Terms of Reference or failed to attend the Hearing, the proceeding would continue in accordance with Art. 18(3) of the ICC Rules. Respondent did not respond to the Chairman's letter. |
| 27.07.2006 | The Chairman informed the Parties in writing that the Terms of Reference Hearing would take place on 5 September 2006 in New York in spite of and notwithstanding Respondent's failure to respond to the Chairman's letters of 10 and 18 July 2006. The Chairman again reminded Respondent to respond to his requests. Respondent again failed to answer. |
| 28.07.2006 | The Arbitral Tribunal formally summoned the Parties to attend the Terms of Reference Hearing in New York City on 5 September 2006 by registered mail against return receipt. The summons repeated that the arbitration would proceed if one Party failed to appear. |
| 28.07.2006 | The Chairman sent to the Parties the draft Terms of Reference and Supplemental Procedural Rules. |

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

| | |
|---|---|
| 02.08.2006 | Claimant filed a summary of its position to be inserted into the Terms of Reference. Respondent did not. |
| 29.08.2006 | The Arbitral Tribunal sent a revised version of the Terms of Reference to both Parties. It once again notified the Parties that should a Party fail to appear at the Terms of Reference Hearing on 5 September 2006 without valid excuse, the Arbitral Tribunal would proceed pursuant to Art. 21(2) of the ICC Rules and would submit the Terms of Reference to the ICC Court for approval. |
| 05.09.2006 | The Terms of Reference Hearing took place in New York City in the unexcused absence of Respondent. At the Hearing, the Terms of Reference were signed by Claimant and the Arbitral Tribunal; the Supplemental Procedural Rules (Order No. 1) and the Provisional Procedural Timetable were discussed and accepted by Claimant; and finally, the appointment of a Secretary to the Arbitral Tribunal was approved by Claimant and the Arbitral Tribunal. |
| 06.09.2006 | The Arbitral Tribunal submitted the Terms of Reference, the Supplemental Procedural Rules (Order No. 1), and the Provisional Procedural Timetable to the ICC Secretariat for approval in accordance with Art. 18(3) of the ICC Rules. It also served upon the Parties the originals of such documents. |
| 09.10.2006 | Claimant submitted to the Arbitral Tribunal its Statement of Claim, an Opinion on Russian Law Issues by Mr. Drew Holiner dated 6 October 2006, "Holiner Opinion" (Cl. Exh. 28) and a Witness Statement of Mr. David Godfrey dated 9 October 2006, "Godfrey Statement" (Cl. Exh. 29). Claimant simultaneously served these documents upon Respondent. |
| 10.10.2006 | The Arbitral Tribunal reminded Respondent to file its Answer to Claimant's Statement of Claim by 27 October 2006 in accordance with the Provisional Procedural Timetable. Respondent let the deadline expire without any response. |
| 16.10.2006 | Upon request of the ICC Court, the Arbitral Tribunal revised the Terms of Reference and sent the revised version to the Parties. It also set a deadline for comments from the Parties. Claimant signed the revised version of the Terms of Reference. Respondent failed to respond. |
| 09.11.2006 | The Arbitral Tribunal sent the revised Terms of Reference (signed by Claimant and the Arbitral Tribunal) to the ICC Court, seeking approval in accordance with Art. 18(3) of the ICC Rules. |
| 08.12.2006 | The ICC Court approved the revised Terms of Reference and invited Respondent to sign and return a copy to the ICC Court. Again, Respondent did not respond. |
| 15.12.2006 | The Arbitral Tribunal informed the Parties of the ICC Court's approval of the revised Terms of Reference signed by Claimant and the Arbitral Tribunal. |
| 17.01.2007 | Claimant filed an updated schedule of interest and other damages claimed under the Loan Agreements, and its statement of arbitration costs. Simultaneously Claimant served these new exhibits upon Respondent. |
| 18.01.2007 | An Evidentiary Hearing took place in New York City in the unexcused absence of Respondent, which had been duly summoned to appear. Claim- |

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

|  | ant and the Arbitral Tribunal extensively questioned Claimant's fact witness, Mr. Godfrey, as well as Claimant's expert witness in Russian law, Mr. Holiner. At the end of the hearing the proceedings were closed in accordance with Art. 22 of the ICC Rules, except for the Post Hearing Briefs to be submitted by the Parties. |
| 23.01.2007 | The Arbitral Tribunal invited the Parties to file simultaneous Post Hearing Briefs by 12 February 2007 in accordance with the Provisional Procedural Timetable. |
| 02.02.2007 | The transcripts of the Evidentiary Hearing were delivered to the Arbitral Tribunal. |
| 08.02.2007 | Claimant served the transcripts of the Evidentiary Hearing upon Respondent. |
| 12.02.2007 | Claimant submitted its Post Hearing Brief to the Arbitral Tribunal and Respondent. Respondent neither filed a Post Hearing Brief nor requested an extension of the time limit to file its Post Hearing Brief. |
| 30.09.2007 | The time limit for the ICC Court to render the Final Award ends. |

## III.    NON-PARTICIPATION BY RESPONDENT

6   As the Procedural Chronology indicates, Respondent systematically failed to participate in the proceedings although it was regularly informed and was well aware of the progress of the case. Respondent neither filed any written submissions (except for its letters of 6 April and 12 May 2006 to the ICC), nor participated at the hearings, without presenting any excuses.

7   The following contacts with Respondent – among others – establish that Respondent was notified and clearly aware of the proceedings:

   1.   By letter dated 6 April 2006, Mr. V.V. Grekhov, then President of Yukos EP, answered the ICC Court's letter of 2 April 2006 which was sent to the address indicated on page 1 of this Final Award.

   2.   By letter of 12 May 2006, Mr. Starodubtsev, then Acting President of Yukos EP, replied to the ICC Court's letter of 9 May 2006 which was sent by fax to Yukos EP at the number indicated on page 1.

   3.   All correspondence from the Arbitral Tribunal was, thereafter, sent to Respondent at the address indicated on page 1 either by fax or by registered mail against return receipt.

   4.   The summons to the Terms of Reference Hearing and both the original and the revised versions of the Terms of Reference were sent to and received by Respondent. Respondent signed, dated and returned the return receipts for these documents on 2 August 2006, 13 September 2006 and 21 December 2006 respectively. The return receipts are on file with the Chairman.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

8   Respondent was given a full and proper opportunity to present its case, its arguments and its evidence to the Arbitral Tribunal, but it failed to do so. In consequence, the Arbitral Tribunal considered Respondent's jurisdictional objections to the ICC, determined such objections to be unfounded, and conducted the arbitration in accordance with Art. 6(3) of the ICC Rules.

## IV.   THE PARTIES' POSITIONS AS REFLECTED IN THEIR SUBMISSIONS

### 1.   Claimant's Position

9   Claimant's position may be summarized as follows:

10   The Parties entered into two Loan Agreements for interest-bearing loans. The first agreement with a total loan amount not exceeding 1,700,000,000 Russian Rubles was signed on 20 July 2004 ("First Loan Agreement"). The second agreement with a total loan amount not exceeding 715,890,000 Russian Rubles was signed on 27 July 2004 ("Second Loan Agreement"). Respondent drew down and Claimant paid out the full amount of the Loans. The Loan Agreements themselves are valid and were never disputed by Respondent.

11   On 2 November 2005, the Parties entered into an Addendum to each of the Loan Agreements. The Addenda amended the Loan Agreements and provided for arbitration in accordance with the ICC Rules. In addition, the Addenda specified New York City as the seat of the arbitration and English as the language of the arbitration. They further provided that the Arbitrators "shall determine the matters at issue in the Dispute in accordance with the substantive law of the State of New York USA".

12   Claimant explained that the decision to enter into the Addenda was taken by the management committee of Yukos Oil Company, the indirect mother company of both Claimant and Respondent. The reason for this decision was that in 2004 the tax authorities of the Russian Federation initiated actions in Russia against Yukos Oil Company in respect of taxes levied on that company. In connection with these proceedings, Yukos Oil Company's shares in Yuganskneftegaz, Yukos' principal production subsidiary, were auctioned on 19 December 2004 and shortly thereafter they were transferred to Rosneft, a company controlled by the Russian Federation. That, according to Claimant, caused Yukos Oil Company's management committee to lose confidence in the Russian jurisdiction and decide to enter into the Addenda.

13   In Claimant's view, the Addenda are valid and enforceable under both Russian and New York law. Claimant points out that the Addenda do not infringe existing company regulations and that the Parties had capacity to conclude them. TMF, acting for Claimant, and Yukos EP, acting for Respondent, were management companies in charge of the Parties' respective businesses. Mr. Godfrey who signed the Addenda on behalf of

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

Respondent, had authority to sign. He was in possession of a written Power of Attorney signed by Mr. Grekhov, then President of Yukos EP. Mr. Grekhov withdrew this Power of Attorney, but only after the Addenda had been validly signed. Moreover, as well as having actual authority, Mr. Godfrey had apparent (or ostensible) authority to sign the Addenda.

14 According to Claimant, it was originally intended that Mr. Grekhov would sign the Addenda but, for reasons of his personal safety, he decided to delegate the signing power to Mr. Godfrey. This explains the inconsistency in the Preamble of the Addenda which mentions Mr. Grekhov as signing the Addenda on behalf of Respondent. Mr. Grekhov was afraid that he might be put in danger if he signed the Addenda himself. In the proceedings against Yukos Oil Company (see para. 12 above), the Office of the General Tax Prosecutor of Russia began actively to call Yukos employees to give testimony. According to Claimant, this was accompanied by varying degrees of threats and several people within Yukos were arrested. The entire management board of Yukos Oil Company fled, as did the senior managers of the company. Mr. Godfrey left Moscow for London while Mr. Grekhov remained in Moscow.

15 Claimant further maintains that Respondent failed to make any interest payments whatsoever under either the First Loan Agreement or the Second Loan Agreement even though Claimant frequently sent reminders, pressing for payment of interest due. Claimant finally accelerated the Loans pursuant to Art. 2.4 of the Loan Agreements on 1 December 2005. It demanded immediate repayment by Respondent of the total principal and interest amounts associated with the Loans.

16 According to Claimant, Respondent is obliged to repay the aggregate principal of the Loans in the total amount of 2,415,890,000 Russian Rubles. Furthermore, Respondent is liable to pay pre-award interest on the total loan amount at the rate of 9% per annum (Loan Agreements, Art. 1.1 and 2.4).

17 In addition, Claimant contends that the Parties agreed that Respondent would pay a penalty in the event of delay in the repayment of the Loans in the amount of 0.1% per day of any amount overdue (Loan Agreements, Art. 3.2, Cl. Exh. 2-3). Since repayment of the Loans became due on 1 December 2005, Respondent is liable under the First Loan Agreement for 702,100,000 Russian Rubles as of 18 January 2007 (the date of the Evidentiary Hearing) and thereafter for 1,700,000 Russian Rubles daily until the date of the Final Award. Under the Second Loan Agreement Respondent is liable for 295,662,570 Russian Rubles as of 18 January 2007 and thereafter for 715,890 Russian Rubles daily until the date of the Final Award. Claimant maintains that such penalty is enforceable under both Russian and New York law, since it represents "liquidated damages".

18 Finally, Claimant seeks post-award interest at the rate of 9% for the outstanding principal amounts and interest on the Loans, as well as post-award interest at the rate of 8.25% for legal costs paid in US dollars and at the rate of 7% for legal costs paid in British pounds.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

2.        **Respondent's Position**

19   Respondent failed to file any written or oral submissions on the merits.

20   However, Respondent informed the ICC Court that it objected to the jurisdiction of the
     Arbitral Tribunal (see Procedural Chronology). Moreover, Mr. Grekhov, in an undated
     letter to Claimant, disputed the validity and enforceability of the Addenda (Cl. Exh. 20).
     In this letter, Mr. Grekhov claimed that the Addenda were signed in breach of existing
     company regulations and that "the Preamble of these documents defines Mr. Grekhov
     as the Party, despite these documents having been signed by David A. Godfrey whose
     name or Powers of Attorney are not mentioned in the texts of the Addendum"; Mr.
     Grekhov also informed Claimant that the Powers of Attorney issued to Mr. Godfrey
     had been withdrawn (Cl. Exh. 20).

21   In light of these statements, the Arbitral Tribunal considers both its jurisdiction and
     Claimant's substantive claims to be contested by Respondent.

## V.        REQUESTS FOR RELIEF

1.        **Relief Requested by Claimant**

22   The relief requested by Claimant is set out in its Statement of Claim. It seeks the
     following relief:

> "It is against this background that the Claimant seeks the following relief in re-
> spect of the First Loan Agreement:
>
> 1)  Repayment of the principal amount under the First Loan Agreement:
>     1,700,000,000 Russian Rubles.
>
> 2)  Payment of interest under clause 1.1 and 2.4 of the First Loan Agreement:
>
>     a.  that accrued prior to 17 January 2005 (the date on which the Request
>         for Arbitration was filed): 228,682,258 Russian Rubles (Details of this
>         sum are provided in Cl. Exh. 39); and
>
>     b.  continuing at a rate of 419,178 Russian Rubles per day until the date of
>         the Final Award.
>
> 3)  Payment of liquidated damages pursuant to clause 3.2 of the First Loan
>     Agreement:
>
>     a.  from 1 December 2005 to 17 January 2006: 79,900,000 Russian Ru-
>         bles; and
>
>     b.  continuing at a rate of 1,700,000 Russian Rubles per day until the date
>         of the Final Award.
>
> In respect of the Second Loan Agreement the Claimant seeks the following re-
> lief:

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

  4) Repayment of the principal amount under the Second Loan Agreement:
     715,890,000 Russian Rubles.

  5) Payment of interest under clauses 1.1 and 2.4 of the Second Loan Agreement:

     a. that accrued prior to 17 January 2005 (the date on which the Request
        for Arbitration was filed): 94,540,405 Russian Rubles (Details of this
        sum are provided in Cl. Exh. 30); and

     b. continuing at a rate of 176,521 Russian Rubles per day until the date of
        the Final Award.

  6) Payment of liquidated damages pursuant to clause 3.2 of the Second Loan
     Agreement:

     a. From 1 December 2005 to 17 January 2006: 33,646,830 Russian Rubles; and

     b. Continuing at a rate of 715,890 Russian Rubles per day until the date of
        the Final Award.

The Claimant also asks for an order that the Respondent pay:

  7) the costs of the arbitration;

  8) its legal costs incurred in pursuing the arbitration; and

  9) interest on the sums ordered to be paid by the Final Award from the date of
     such Final Award until payment at the rate of 9% per annum."

(Statement of Claim, para. 26 – 28, numbering changed.)

23  In its Post Hearing Brief, Claimant amended point 9 above, reducing its claim for post-
    award interest for legal costs. Claimant now seeks 8.25% interest on its legal costs in
    US dollars and 7% interest on such costs in British pounds (Claimant's Post Hearing
    Submissions para. 57.2- 57.3). On the other hand, Claimant increased its cost figure in
    the Post Hearing Brief by British pounds 8,000, due to additional costs incurred since
    the hearing in New York (Claimant's Post Hearing Submissions para. 55).

### 2.        Relief Requested by Respondent

24  Respondent did not file a request for relief. However, under the circumstances, the
    Arbitral Tribunal considers each of Claimant's claims to be contested by Respondent
    (see para. 19-21 above).

## VI.    LEGAL ANALYSIS

### 1.        Are the Addenda Valid and Binding on the Parties?

25  Before turning to the substance of the dispute, the Arbitral Tribunal addresses two
    preliminary questions in this arbitration, namely whether it has jurisdiction to decide the
    case and, if so, what law is now applicable to the Loan Agreements.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

26   In the Loan Agreements, the Parties stipulated that all disputes and differences arising out of or in connection with the Loan Agreements would be submitted to the International Commercial Arbitration Court at the Chamber of Trade and Industry of the Russian Federation in accordance with its rules and procedures (Loan Agreements, Art. 5.1). Furthermore, the Parties declared the laws of the Russian Federation to be applicable (Loan Agreements, Art. 6.1).

27   By contrast, it is not disputed that on 2 November 2005 two Addenda were concluded which, after referring explicitly to the arbitration and choice of law clauses in Art. 5.1 of the Loan Agreements, amended and restated in Art. 1 the entire dispute resolution provision as follows:

> *"Any dispute, claim, or controversy arising out of or relating to this Agreement, or the performance, breach, validity, interpretation, application, or termination thereof ("Dispute"), shall be finally resolved by arbitration in accordance with the then current rules of Arbitration of the International Chamber of Commerce ("ICC Rules"), and judgment on the award may be entered in any court having jurisdiction thereof.*
>
> *The seat of the arbitration shall be New York City, U.S.A., and the language of the arbitration shall be English. The arbitrator(s) shall determine the matters at issue in the Dispute in accordance with the substantive law of the State of New York, USA.*
>
> *The Dispute shall be heard and determined by an Arbitral Tribunal consisting of three arbitrators, each of whom shall be independent and impartial.*
>
> *Each party shall, within 30 days after commencement of the arbitration, select one person to act as arbitrator. The two arbitrators so selected shall, within 15 days of their appointment, select a third arbitrator who shall serve as the chairperson of the Arbitral Tribunal. The arbitrators selected shall be qualified by education, training, and experience to hear and determine matters in the nature of the Dispute.*
>
> *If a party fails to appoint an arbitrator as provided herein, or if the arbitrators selected by the parties are unable or fail to agree upon a third arbitrator within 30 days of their appointment, then that arbitrator shall be selected and appointed in accordance with the ICC Rules. The arbitrators selected shall be qualified by education, training, and experience to hear and determine matters in the nature of the Dispute.*
>
> *Should an arbitrator die, resign, refuse to act, or become incapable of performing his or her functions as an arbitrator, the ICC may declare a vacancy on the Arbitral Tribunal. The vacancy shall be filled by the method by which that arbitrator was originally appointed.*
>
> *The arbitrators shall be bound by and shall follow the then current International Bar Association standards of Ethics for International Arbitrators."*

28   Art. 3 of the Addenda provided that the language quoted above shall supersede all prior written or verbal understandings between the Parties with respect to dispute resolution, arbitration and applicable law under the Loan Agreements.

29   Nevertheless, since Respondent disputes the validity and enforceability of the revised arbitration clauses in the Addenda, the Arbitral Tribunal first examines the possible deficiencies of the Addenda that are reflected in the following questions:

*- Does the Arbitral Tribunal have jurisdiction?*

**R. J. LOOSLEY**
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

- *Did the Parties have legal capacity to enter into the Addenda without breaching company regulations?*

- *Did the persons who acted on behalf of the Parties, in particular Respondent, have the power to enter into the Addenda?*

- *Could the Parties validly derogate from the application of Russian law in favor of New York law?*

*Jurisdiction*

30  With respect to the first question, whether the Arbitral Tribunal has jurisdiction, the outcome depends on the validity of the Addenda as between the Parties. If the Addenda have been validly concluded and are legally binding upon the Parties, then the jurisdiction clause contained therein is very clear: An Arbitral Tribunal of the ICC shall have jurisdiction to decide any dispute, claim or controversy relating to performance, breach, validity, interpretation, application, or termination of the underlying (main) agreements. Thus, the questions of the Parties' legal capacity to enter into the Addenda and the authority of the persons that acted on behalf of the Parties shall be examined first.

*Legal Capacity to Enter into Addenda*

31  The question of whether the Parties had legal capacity to enter into the Addenda depends on the corporate powers available to them under the applicable corporate law. In this connection, the Arbitral Tribunal notes that when concluding an arbitration agreement, directors and officers of corporate parties must act in accordance with the corporation's constitution and its governing laws. The law governing a corporation is that of its place of incorporation (Redfern / Hunter / Blackaby / Partasides, Law and Practice of International Commercial Arbitration, 4th ed., London 2004, 3-27). Thus, Claimant's directors and officers were obliged to observe Claimant's constitution and the laws of Luxembourg. Respondent's directors and officers were obliged to observe Respondent's constitution and the laws of Russia.

32  Even though Respondent did not specifically assert that one or both Parties lacked legal capacity to conclude the Addenda, it may be inferred from Respondent's position, discussed at para. 20 above, that Respondent's capacity to act – if not also Claimant's – is disputed. If one of the Parties lacked legal capacity to enter an arbitration agreement, such agreement would be invalid (see Redfern / Hunter / Blackaby / Partasides, Law and Practice of International Commercial Arbitration, 4th ed., London 2004, 3-25). The general rule is that any natural or legal person who has capacity to enter into a valid agreement has also capacity to enter into an arbitration agreement (Redfern / Hunter / Blackaby / Partasides, Law and Practice of International Commercial Arbitration, 4th ed., London 2004, 3-25; Fouchard / Gaillard / Goldman on International Commercial Arbitration, E. Gaillard and J. Savage (eds.) (1999), para. 465).

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

33  Respondent did not allege that Claimant lacked power to enter into the original arbitration agreement stipulating arbitration in Russia. Nor did Respondent allege that Claimant lacked capacity to conclude the Addenda under its constitution and Luxembourg law. Likewise, the Arbitral Tribunal is not aware of any provision in Claimant's constitution (see Cl. Exh. 8) or Luxembourg law which would prevent or prohibit Claimant from amending agreements previously entered into and/or concluding arbitration agreements such as the one contained in the Addenda. Thus, the Arbitral Tribunal holds that Claimant had legal capacity to enter into the Addenda.

34  As regards Respondent, its Bylaws do not prohibit Respondent from entering into arbitration agreements (Holiner Opinion, para. 34). On the contrary, the Bylaws expressly state that Respondent "may close transactions, acquire and exercise property and personal nonproperty rights and assume obligations necessary to engage in any kinds of business not prohibited by law". The Bylaws continue that Respondent may "*be plaintiff and defendant in a court of law, arbitration court or other judicial bodies*" (Samaraneftegaz Bylaws, Art. 2.3, Cl. Exh. 27, emphasis supplied). This language supports the view that Respondent, under its Bylaws, had legal capacity to enter into contract amendments and arbitration clauses such as the ones contained in the Addenda. Similarly, Russian law does not prohibit parties to international commercial contracts from concluding arbitration agreements. Russia itself has an International Commercial Arbitration Court at the Chamber of Commerce and Industry of the Russian Federation to which the Parties initially referred in the Loan Agreements (Loan Agreements, Art. 5.1). So, arbitration courts – if properly agreed upon - may deal with the subject matter in dispute.

35  In conclusion, both parties, Claimant and Respondent, had capacity to enter into contracts, contract amendments and arbitration agreements such as the ones contained in the Addenda.


*Power to Enter into the Addenda*

36  Capacity to act does not automatically comprise *authority* to enter into a contractual agreement. So, the third question to be examined is whether the persons who acted on behalf of the Parties, in particular Mr. Godfrey on Respondent's side, had the power to act and to bind the Parties by their signatures. In this regard, the Arbitral Tribunal shall examine whether the signing representatives had actual – or, at least, apparent (or ostensible) – authority to sign the Addenda on behalf of the Parties.

37  On Claimant's side, the Addenda were signed by TMF which derived its authority to act from a resolution of Claimant's sole shareholder dated 31 January 2003. This Resolution appointed TMF as the sole manager of Claimant and stated that Claimant would "be bound in all circumstances by the sole signature of its single manager" (Yukos Capital Resolution of the Sole Shareholder, 31 January 2003, Art. 1-2, Cl. Exh. 8, page 6). The persons signing the Addenda on behalf of Claimant were Mr. P. Kotoula and Mr. J.H.W. van Koeverden Brouwer (Godfrey Statement, para. 21). Both

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

were board members of TMF at the time with joint signatory powers (see TMF's listing on Luxembourg Register of Companies and Commerce, 10 October 2005 and 20 February 2006, Cl. Exh. 10). This is undisputed by Respondent. In addition, the Arbitral Tribunal is not aware of any provision in Claimant's constitution or Luxembourg law which would prevent or prohibit the appointment of TMF as the sole management company of Claimant, or which would prohibit the two board members of TMF to sign agreements such as the Addenda. Thus, Mr. Kotoula and Mr. van Koeverden Brouwer had authority to and did bind Claimant by their signatures on the Addenda.

38  On Respondent's side, the Addenda were signed and sealed, on behalf of Yukos EP, by Mr. Godfrey (Cl. Exhibit 3 and 4; Godfrey, Transcript, 87/15-16). Mr. Godfrey acted on the basis of a Power of Attorney granted to him on July 26, 2005 (Cl. Exh. 18).

39  The source of Yukos EP's power to sign and act on behalf of Respondent is the Agreement on Transfer of Powers of Executive Bodies of 23 September 1998 between Respondent and Yukos EP (Agreement on Transfer of Powers of Executive Bodies, Cl. Exh. 17).[1] This Agreement authorizes Yukos EP to "[e]xercise all the powers of [Respondent's] executive body as they are defined by [Respondent's] Bylaws and in compliance with the limitations established by the Bylaws and the current law" (Agreement on Transfer of Powers of Executive Bodies, Art. 3.1.1, Cl. Exh. 17).

40  Respondent's Bylaws expressly recognize Respondent's authority to assign the powers of the sole executive body (General Director) by contract to a commercial organization (management organization) such as Yukos EP (Samaraneftegaz Bylaws, Art. 11.6, Cl. Exh. 27; Holiner, Transcript 112/11 – 113/3). All functions of Respondent's executive body are then performed by the management organization and its executive body (Samaraneftegaz Bylaws, Art. 11.1, Cl. Exh. 27).

41  The authority of Yukos EP to act on behalf of Respondent extended, in particular, to all day-to-day operations, including representing Respondent's interest, closing transactions on behalf of Respondent, approving the staff, issuing orders and giving instructions that are binding on all Company employees, filing suits and claims on behalf of the Company, signing documents, issuing and withdrawing powers of attorney and representing Respondent in court (Samaraneftegaz Bylaws, Art. 11.2-11.3, Cl. Exh. 27; see also Russian Law on Joint Stock Companies, Art. 69(2)). It is also the undisputed opinion of Claimant's legal expert, Mr. Holiner, that Yukos EP's competence included the power to sign the Addenda (Holiner, Transcript 113/12-115/9, 121/21-123/16).

42  Mr. Godfrey explained at the evidence hearing in New York that he acted as senior in-house legal advisor to the group of companies owned by Yukos Oil Company but that he was not a board member or officer of Yukos EP. Nor did he have general signatory power for Respondent or Yukos EP. Therefore, he derived his authority to sign the Addenda from a special Power of Attorney dated 26 July 2005 (Godfrey Statement, para.

---

[1]  Yukos EP also represented Respondent when disputing the ICC's jurisdiction in its letters of 6 April 2006 and 12 May 2006 (see Procedural Chronology).

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

19). The question, now, is whether or not such Power of Attorney was validly granted to Mr. Godfrey and whether or not it conferred sufficient authority upon him to bind Respondent by his signature.

43   According to Art. 185(5) of the Russian Civil Code, the general rule is that a power of attorney issued by a legal entity is valid if it is (1) signed by the organisation's chief executive officer or another person empowered under the company's constitutional documents, and (2) the organisation's seal is affixed to the power (Samaraneftegaz Bylaws, Cl. Exh. 27; Holiner Opinion, para. 16). The Power of Attorney granted to Mr. Godfrey was signed by Mr. Grekhov. Mr. Grekhov, undisputedly, was then President of Yukos EP (Godfrey Statement, para. 18) and he could, in this position, according to Yukos EP's and Respondent's Bylaws, issue powers of attorney (Yukos EP Bylaws, Art. 12.3, Cl. Exh. 26; Samaraneftegaz Bylaws, Art. 11.3, Cl. Exh. 27). In addition, the Power of Attorney carried Respondent's seal. The Power of Attorney granted to Mr. Godfrey, therefore, is to be considered valid.

44   The Power of Attorney authorized Mr. Godfrey, on behalf of Respondent, to "[c]onclude (amend, supplement) on behalf of the Corporation agreements (arrangements, contracts) and undertake all and any actions and formalities pertinent to the execution of such agreement (arrangements, contracts), including signature of all and any collateral documents drawn up in the process of the execution of such agreements (arrangements, contracts)" (see Power of Attorney, Cl. Exh. 18, first bullet point). The Power of Attorney further allowed Mr. Godfrey to represent Yukos EP (which in turn was empowered to represent Respondent) "in all Russian, foreign and international courts, arbitration courts and reference tribunals" (Power of Attorney, Exh. 18, second bullet point).

45   The conclusion to be drawn is that the Power of Attorney authorized Mr. Godfrey to sign the Addenda on behalf of Respondent.

46   Finally, the Power of Attorney was still in force when Mr. Godfrey – as representative of Yukos EP – signed the Addenda. The Power of Attorney was issued on 26 July 2005 while the Addenda were signed on 2 November 2005. Mr. Grekhov alleged in an undated letter to Yukos Capital S.a.r.l that the Power of Attorney had been withdrawn (Cl. Exh. 20). However, Mr. Grekhov did not contend that this withdrawal was communicated to Mr. Godfrey prior to his signing the Addenda. Under Russian law (Art. 189(2) of the Russian Civil Code), a withdrawal of a power of attorney becomes effective only when it is communicated to the person to whom the power of attorney was granted (compare Holiner, Transcript 120/12-20; Godfrey, Transcript 64/8-17). According to Mr. Godfrey's undisputed testimony, he received Mr. Grekhov's letter by email on 16 December 2005 (Godfrey Statement, para. 19). This was the first time he learned of the withdrawal of the Power of Attorney (Godfrey, Transcript 64/8-20). Given that Mr. Godfrey received Mr. Grekhov's letter approximately six weeks after the Addenda were signed, the letter cannot retroactively invalidate Mr. Godfrey's signature on the Addenda.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

47  Mr. Grekhov in his letter to the ICC alleged a further deficiency in Mr. Godfrey's authority to sign the Addenda, namely that the preamble to the Addenda referred to Mr. Grekhov as the signing representative whereas, in fact, Mr. Godfrey signed the document. In the Arbitral Tribunal's view, this inconsistency has no effect on Mr. Godfrey's authority to act under the Power of Attorney. It is explained by the signing history of the Addenda. According to Claimant, it was originally intended that Mr. Grekhov would sign the Addenda, but for reasons of his personal safety, he preferred to grant a power of attorney to Mr. Godfrey (see para. 14 above; Post Hearing Submission para. 19). From a legal perspective it needs to be emphasized that the Addenda were agreements between Claimant and Respondent, not between the signing persons. The signing persons were not parties to the Addenda other than in their representative functions, and their identity is irrelevant as long as they were duly authorized to act on behalf of their principals, which, as discussed above, they were (see also Holiner Opinion, para. 31).

48  Thus, the acting Party representatives, and in particular Mr. Godfrey, had actual authority to enter into the Addenda. The Power of Attorney granted to Mr. Godfrey was valid, it entitled him to sign the Addenda on behalf of Respondent and it was still in force at the time of signing. Under these circumstances, the question of apparent or ostensible authority, alleged subsidiarily by Claimant, need not be addressed.

*Validity of the Choice of New York Law*

49  With regard to the fourth and final question concerning the Addenda, namely whether or not the Parties' choice of New York law was valid, reference is made to Art. 1210(1) of the Civil Code of the Russian Federation. This provision allows parties entering into a contract to select – by agreement – the law governing their rights and duties.

50  The provision reads as follows: "The parties to a contract may in concluding the contract or *thereafter* choose by agreement among themselves the law that is applicable to their rights and duties under the contract" (emphasis added). According to Article 1210(3) of the Civil Code of the Russian Federation, the choice of the applicable law made after the conclusion of the contract has retroactive force and is considered in effect from the moment of conclusion of the contract. The Civil Code of the Russian Federation does not require in such situations that the law chosen should have a connection to the contract, and the parties from two different countries (like in the given case) may subordinate their contract to the law of a third country.

51  It may also be added that the Respondent nowhere questions the very possibility for the Parties to reach an arbitration agreement to settle disputes in Russia or abroad and to agree upon the law applicable (Russian or foreign). Moreover, it expressly confirms that, as stated in its letter of 12 May 2008: "In accordance with the generally accepted international norms of law and the national legislation of the Russian Federation, the parties to the agreement are free in their expression of will regarding all terms and conditions of the agreement, including the issues of determining the venue of con-

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

sideration of the disputes, arising from performance of the agreement, and the governing law."

52   Therefore, the Parties' choice of New York law was valid


*Conclusion*

53   Based on the above, the Arbitral Tribunal concludes: (1) that this Arbitral Tribunal has jurisdiction over this matter, (2) that the Parties had the capacity to and did enter into the Addenda, which are binding upon the Parties, (3) that the Addenda validly amended the dispute resolution mechanisms of the Loan Agreements, and (4) that the Addenda and the underlying Loan Agreements must be examined under New York Law.


### 2.        Are the Loan Agreements Valid and Binding on the Parties?

54   On 20 July 2004, the Parties concluded the First Loan Agreement (Cl. Exh. 1) and, on 27 July 2004, they concluded the Second Loan Agreement (Cl. Exh. 2). Apart from the different loan amounts, the terms of the two Loan Agreements are identical.

55   The validity and enforceability of the original Loan Agreements are not disputed between the parties.

56   It is also not disputed that Claimant paid out both Loans to Respondent. On 20 July 2004, Claimant wire transferred to Respondent the total of the first loan in the amount of 1,700,000,000 Russian Rubles (Yukos Capital Bank Statement, Cl. Exh. 12) and, on 30 July 2004, it wire transferred to Respondent the total of the second loan in the amount of 715,890,000 (Yukos Capital Bank Statement, Cl. Exh. 14).


### 2.1        Breach of the Loan Agreements

57   Claimant alleges that Respondent never made any interest payments despite several reminders and that it therefore breached the Loan Agreements.

58   In the Loan Agreements, the Parties agreed on interest (hereinafter "loan-interest") at the rate of 9% per annum (Loan Agreements, Art. 1.1), accruing quarterly and payable no later than on the last business day of the last month of each quarter (Loan Agreements, Art. 2.4). Since the Loans were paid out on 20 July 2004 (First Loan) and 30 July 2004 (Second Loan) respectively, the first interest payments were due on 30 September 2004. Respondent never questioned its obligation to pay loan-interest under the Loan Agreements. To the contrary, it confirmed the obligation in writing (Letter of 14 November 2005 from Samaraneftegaz to Yukos Capital, Cl. Exh. 15; Letter of 5 December 2005 from Samaraneftegaz to Yukos Capital, Cl. Exh. 19).

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

59   Claimant sent Respondent reminder letters on 19 October 2004 and 27 January 2005, asking Respondent to pay loan-interest pursuant to the terms of the Loan Agreements (Cl. Exh. 5). On 15 November 2005, Claimant sent invoices to Respondent at the latter's request, and informed Respondent that the total amount of loan-interest due was 258,887,181 Russian Rubles. It reminded Respondent once again of its payment obligations (Letter of 15 November 2005 from Yukos Capital to Samaraneftegaz, Cl. Exh. 5). On 5 December 2005, Respondent confirmed in writing the loan-interest balance in the amount of "258,887.2 thousand" Russian Rubles (Letter of 5 December 2005 from Samaraneftegaz to Yukos Capital, Cl. Exh. 19). Nonetheless, Respondent never made any loan-interest payments. Thus, Respondent is in breach of its interest payment obligations under both Loan Agreements.

60   With regard to the repayment of the Loans, Claimant alleged that, based on the outstanding loan-interest payments, it accelerated the Loans and requested immediate repayment of the principal amounts by letter dated 1 December 2005. Claimant expressly referred to Art. 2.4.1. and Art. 2.4.2 of the Loan Agreements and announced that, failing receipt of loan-interest payments, it would consider there to be a delay in repayment of the Loans (Letter of 1 December 2005 from Yukos Capital to Samaraneftegaz, Cl. Exh. 6). Claimant states that Respondent has continued to breach its repayment obligations from 1 December 2005 to the present.

61   The Arbitral Tribunal notes that Respondent was indeed obliged to repay the Loans to Claimant no later than 31 December 2007 (Loan Agreements, Art. 2.4). But, the Loan Agreements contained an acceleration clause stating that repayment of the Loans would become due before maturity (1) if Claimant had sufficient grounds to reckon that Respondent's financial position would not allow timely repayment of the Loans, or (2) in the case of other events defined by the laws of the Russian Federation from time to time in force (Loan Agreements, Art. 2.4.1-2.4.2). The Arbitral Tribunal also notes that "interest for the use of funds" was to be paid "at the rate of 9% per annum" (Loan Agreements, Art 1.1) and that the Loans shall be deemed to be repaid only "at the time when respective funds have been credited to the Lenders bank account" (Loan Agreements, Art. 2.4).

62   It is uncontested that as of 1 December 2005: (1) Claimant had not received any interest payments from Respondent despite several reminders; (2) Respondent had not presented any balance sheets to Claimant (Letter of 1 December 2005 from Yukos Capital to Samaraneftegaz, Cl. Exh. 6); (3) tax claims had been presented to Respondent in the amount of nearly 25 billion Russian Rubles; and (4) Respondent's bank accounts had been frozen (Letter of 5 December 2005 from Samaraneftegaz to Yukos Capital, Cl. Exh. 19). After 1 December 2005, Respondent continued to default on its obligation to pay interest and never gave any assurances that it would be able timely to repay the Loans.

63   Under these circumstances, Claimant had sufficient grounds to reckon that Respondent's financial position would not allow timely repayment of the Loans and was entitled to exercise its right to accelerate repayment of the Loans under Art. 2.4.1 of the Loan Agreements.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

64  Furthermore, Art. 450 of the Russian Civil Code recognizes *"essential violation of the contract"* as a ground on which contracts may be amended or cancelled. Leaving aside the obligation to repay the principal amount, payment of interest is the main obligation of a borrower. Therefore, the failure to pay interest on the Loans – especially in the face of numerous reminders from Claimant – is an "essential violation" of the Loan Agreements. Art. 2.4.2 of the Loan Agreements and Art. 450 of the Russian Civil Code thus provide an additional basis for Claimant's acceleration of Respondent's repayment obligation under the Loan Agreements.

65  Accordingly, Respondent has been in breach of its repayment obligation since Claimant's letter of 1 December 2005, the receipt of which was never contested by Respondent.

66  Claimant also asserted that, after termination of the Loans, Respondent was obligated to continue to make interest payments at the rate of 9% p.a. and to pay penalty interest (hereinafter penalty-interest) of 0.1% of the amount due per day. In its letter to Respondent of 1 December 2005, Claimant requested payment of interest and informed Respondent that it would charge additional penalty-interest pursuant to Art. 3.2 of the Loan Agreements (Letter of 1 December 2005 from Yukos Capital to Samaraneftegaz, Cl. Exh. 6).

67  The Arbitral Tribunal finds that the acceleration of the Loans resulted in their early termination and in a conversion of Respondent's obligation to pay loan-interest into an obligation to pay default interest (hereinafter "default-interest"). Applying the same rate of 9% for the use of the Loans prior to and after the termination is justified because the funds continue to be available to Respondent. The question is only to what extent and in what amount additional penalty-interest becomes due. A crucial point in this connection is whether the penalty clauses in the Loan Agreements are valid and enforceable.

68  Art. 3.2 of the Loan Agreements reads as follows:

> *"In the event of delay in the repayment of the loan by the Borrower [Respondent] the Lender [Claimant] is entitled to require that penalty be payable by the Borrower [Respondent] in the amount of 0,1 (zero point one) per cent in the day of the amount overdue. The payment of the penalty shall not relieve the Borrower [Respondent] from fulfillment of the obligation in kind (i.e. of the repayment of the loan and/or of payment of interest for using the loan)."*

69  In its submission to the Arbitral Tribunal, Claimant has argued that under Russian law penalty clauses are enforceable, provided they are made in writing and subject to a right of the Courts to reduce a penalty that is *"obviously out of proportion with the consequences of the violation of the obligation"*; Art. 3.2 of the Loan Agreements is thus enforceable under Russian law (Post Hearing Submissions, para. 42.1; see also Russian Civil Code, Art. 330-331). Claimant has further argued that under New York law the "penalty" in Art. 3.2 must be characterized as liquidated damages in compensation for Claimant's losses in excess of interest payments (Statement of Claim para. 55.1 et seq.; Post Hearing Submissions para. 42.2). According to Claimant, the liquidated damages sought were not "plainly or grossly disproportionate to the probable loss suf-

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

fered by Claimant"( Post Hearing Submissions para. 47.3). Claimant also suggested that the trend under New York law has been to uphold parties' agreements and that the burden of proving that the clause was unenforceable would rest on the party alleging it (Post Hearing Submissions, para. 44.2-44.3).

70   The law applicable to the Loan Agreements is New York law (see para. 53 above).

71   Under New York law, a liquidated damages provision in a contract is enforceable if the liquidated amount bears a reasonable proportion to actual damages caused by a breach of the contract and is not a penalty. Whether a contract provision constitutes enforceable liquidated damages or an unenforceable penalty is a matter of analysis and not simply what the parties have chosen to call the provision. *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y. 2d 420, 425 (1977).

72   New York law considers a contract provision giving both liquidated and actual damages void as a penalty. *Jarro Bldg. Indus. Corp. v. Schwartz*, 281 N.Y.S.2d 420, 422 (Sup. Ct. 1967) ("If appellant here could recover both liquidated and actual damages, there would be no question that the liquidated damages provision was a penalty."). The New York Supreme Court's Appellate Division has held that it is a "general rule that a failure to pay a sum of money due will rarely, if ever, justify a further sum, in excess of interest, to be paid by way of liquidated damages. On the contrary, such a requirement is likely to be condemned as a penal forfeiture which the law will not recognize." *Manhattan Syndicate, Inc. v. Ryan*, 220 N.Y.S.2d 337, 340 (1st Dep't 1961); *see also In re O.P.M. Leasing Servs., Inc.*, 23 B.R. 104, 112 (Bankr. S.D.N.Y. 1982).[2]

73   Art. 3.2 of the Loan Agreements provides for recovery of both liquidated damages (in the form of a daily payment of 0.1% of the outstanding principal amount) and actual damages (in the form of interest payments at the rate of 9% p.a.). Therefore, Art. 3.2 is unenforceable under New York law.

74   This conclusion is reinforced when Art. 3.2 is analyzed under the two-part test used by New York courts to determine whether a liquidated damages clause is enforceable. The test provides that a contractual provision fixing damages in the event of breach will be sustained only if (1) the agreed sum is a reasonable estimate of potential damages, i.e. not plainly or grossly disproportionate to the possible loss, and (2) actual damages are difficult to determine, or are not readily ascertainable. *Howard Johnson Int'l Inc. v. HBS Family, Inc.*, No. 96 CIV. 7687 (SS), 1998 WL 411334, at *5 (S.D.N.Y July 22, 1998). In determining the proportionality of such a provision, New York courts

---

[2]   Claimant's reliance upon the decision of the Second Circuit Court of Appeals in *Walter E. Heller v. American Flyers Airline Corp.*, 459 F.2d 896 (2d Cir. 1972), is misplaced. The decision in *Heller* did not allow the payment of liquidated damages in excess of interest; the loan in *Heller* was unconsummated (unlike the consummated loan in this case) and the damages amount was not in addition to, but in lieu of, actual damages. *See O.P.M. Leasing Servs., Inc.*, 23 B.R. at 114. Similarly, *JMD Holding Corp. v. Congress Financial Corp.* does not advance Claimant's case because liquidated damages in *JMD Holding Corp.* were in lieu of interest, which ceased to be payable due to the early termination of the loan agreement at issue in that case. 4 N.Y.3d 373 (N.Y. 2005).

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

consider the actual loss sustained as a result of the breach. *See, e.g., City of Rye v. Public Serv. Mut. Ins. Co.*, 34 N.Y.2d 470, 473 (1974). With respect to whether a loss is difficult to determine, the actual loss on an outstanding principal sum is interest, which is agreed in advance and, therefore, not difficult to determine. *Motichka v. Cody*, 773 N.Y.S.2d 46, 48 (1st Dep't 2004).

75   Art. 3.2 fails to meet the two-part New York test for enforceability because: (1) the liquidated damages for which it provides are not a reasonable estimate of potential damages flowing from Respondent's breach of the Loan Agreements, and (2) Claimant's actual losses were readily ascertainable at the time the Loan Agreements were negotiated. Liquidated damages under Art. 3.2 are proportionate to neither the actual loss nor the loss likely to have resulted from a default, which in this case are one and the same, namely interest payments. Moreover, interest on a principal sum is not difficult to determine where, as here, it has been contractually agreed in advance.

76   Claimant accepts that, apart from loss of interest and management time, there is no other specific loss suffered to date (Post Hearing Submissions para. 47.1). The loss of management time as a result of Respondent's default has not been quantified by Claimant, nor has Claimant provided any evidence of the quantum of any such loss. In the absence of such evidence, the award of damages is limited to the actual loss proved by Claimant, namely loan-interest at the rate of 9% p.a. prior to and after termination.

## 2.2   Quantum

### 2.2.1   Repayment of Loans

77   Respondent is obliged to repay the Loans to Claimant. The principal under the First Loan Agreement amounts to 1,700,000,000 Russian Rubles, and the principal under the Second Loan Agreement amounts to 715,890,000 Russian Rubles.

78   Respondent is further obliged to pay loan-interest at the rate of 9% p.a. for the period up to 1 December 2005. Thereafter default-interest is owed at the same rate (see para. 66-78 above).

79   Claimant requested that a specific amount of interest be awarded, calculated up to and including the date of the Final Award. Claimant filed an interest calculation for each of the Loan Agreements (Cl. Exh. 31).

80   For the First Loan of 1,700,000,000 Russian Rubles, Claimant calculated a daily interest amount of 419,178 Russian Rubles and a total interest amount of 382,101,406 Russian Rubles up to the date of the Evidentiary Hearing on 18 January 2007 (Cl. Exh. 31). The daily interest amount was not contested by Respondent and was generally correctly calculated, but Claimant's interest calculation took as a starting date 19 July 2004 (Cl. Exh. 30). Since the First Loan was paid out on 20 July 2004 (see para.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

56 above), the Arbitral Tribunal begins to calculate interest from this date and re-calculates Claimants interest claim (in Russian Rubles) as follows:

| Period of interest | Days | Amount of interest |
|---|---|---|
| 20.07.2004 - 30.09.2004 | 72 | 30,180,816 |
| 01.10.2004 - 31.12.2004 | 92 | 38,564,376 |
| 01.01.2005 - 31.03.2005 | 90 | 37,726,020 |
| 01.04.2005 - 30.06.2005 | 91 | 38,145,198 |
| 01.07.2005 - 30.09.2005 | 92 | 38,564,376 |
| 01.10.2005 - 31.12.2005 | 92 | 38,564,376 |
| 01.01.2006 - 17.01.2006 | 17 | 7,126,026 |
| Interim Result | | 228,871,188 |
| 18.01.2006 - 18.01.2007 | 365 | 152,999,970 |
| Interim Result | | 381,871,158 |
| 19.01.2007 - 15.08.2007 | 208 | 87,189,024 |
| Result | | 469,060,182 |

81  The interest due under the First Loan Agreement until the Final Award amounts to 469,060,182 Russian Rubles.

82  For the Second Loan of 715,890,000 Russian Rubles, Claimant calculated a daily interest amount of 176,521 Russian Rubles and a total interest amount of 159,147,091 Russian Rubles up to the date of the Evidentiary Hearing on 18 January 2007 (Cl. Exh. 31). Again, the daily interest amount was not contested by Respondent and was generally correctly calculated, but Claimant's interest calculation took as a starting date 29 July 2004 (Cl. Exh. 30). Since the Second Loan was paid out on 30 July 2004 (see para. 56 above), the Arbitral Tribunal begins to calculate interest from this date and re-calculates Claimants interest claim (in Russian Rubles) as follows:

| Period of interest | Days | Amount of interest |
|---|---|---|
| 30.07.2004 - 30.09.2004 | 62 | 10,944,302 |
| 01.10.2004 - 31.12.2004 | 92 | 16,239,932 |
| 01.01.2005 - 31.03.2005 | 90 | 15,886,890 |
| 01.04.2005 - 30.06.2005 | 91 | 16,063,411 |
| 01.07.2005 - 30.09.2005 | 92 | 16,239,932 |
| 01.10.2005 - 31.12.2005 | 92 | 16,239,932 |
| 01.01.2006 - 17.01.2006 | 17 | 3,000,857 |

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

| | | | |
|---|---|---|---|
| Interim Result | | | 94,615,256 |
| 18.01.2006 – 18.01.2007 | 365 | | 64,430,165 |
| Interim Result | | | 159,045,421 |
| 19.01.2007 – 15.08.2007 | 208 | | 36,716,368 |
| Result | | | 195,761,789 |

83   Interest due under the Second Loan Agreement up to the Final Award amounts to 195,761,789 Russian Rubles.

84   The total interest amount under both Loan Agreements up to the Final Award date thus amounts to 664,821,971 Russian Rubles.

85   Further post-award interest at the contract rate of 9% p.a. are awarded on the Loan and Loan interest amounts from the date of the Final Award up to the date of payment (see Redfern / Hunter / Blackaby / Partasides, Law and Practice of International Commercial Arbitration, 4th ed., London 2004, 8-90).

86   Claimant's request for liquidated damages in the amount of 702,100,000 Russian Rubles under the First Loan Agreement and 295,662,570 Russian Rubles under the Second Loan Agreement is rejected (see para. 69 - 73 et seq. above).

87   Interest on legal costs and expenses are not customary in international arbitrations and Claimant's request to award such interest is also rejected.


## VII.   FEES AND EXPENSES

88   The costs of the arbitration include the fees and expenses of the Arbitrators, the ICC Court's administrative expenses fixed by the Court in accordance with the scale in force at the time of the commencement of the arbitral proceedings, and reasonable legal and other costs incurred by the Parties for the arbitration (ICC Rules, Art. 31(1)).

89   The Final Award shall fix the costs of the arbitration and decide which of the Parties shall bear them or in what proportion they shall be borne by the Parties (ICC Rules, Art. 31(3)).

90   In the Terms of Reference the Arbitral Tribunal calculated an amount in dispute of US$ 102,212,107. When Claimant further substantiated its claim at the Evidentiary Hearing of 18 January 2007, the Arbitral Tribunal recalculated the amount in dispute and fixed it at US$ 140,663,827 (excluding interest) and US$ 148,870,777 (including interest). The Arbitral Tribunal's recalculation was communicated to the ICC Court by letter of 1 February 2007.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

91   Claimant paid both shares of the original and the increased advance on costs fixed by the ICC Court in the total amount of US$ 680,000.

92   Claimant fully succeeded on its claim for the repayment of the Loans and payment of pre- and post-award interest at the rate of 9% p.a. Claimant failed, however, on its claim for liquidated damages and certain other post-award interest such as interest on legal costs and expenses (see 87 above). In view of Claimant's failure to succeed in full, Claimant shall bear 1/4 and Respondent shall bear 3/4 of the costs of the arbitration.

93   As to reasonable legal and other costs incurred by the Parties in the arbitration, Claimant produced at the Evidentiary Hearing of 18 January 2007 statements of fees and expenses. According to these statements, Claimant's legal fees and expenses amounted to a total sum of US$ 363,699.58 Cl. Ex. 32, p. 3). Claimant assured the Arbitral Tribunal at the Evidentiary Hearing that its statements only cover fees and expenses starting from the preparation of the request of arbitration and do not include pre-arbitration costs (Collins, Transcript 17/11-13). Claimant has further indicated in its post-hearing submission that it has incurred additional costs of GBP 8,000 in connection with the hearing and the post hearing submission (Post-Hearing Brief of 13. February 2007, p. 26). GBP 8,000 at the interbank conversion rate of February 13, 2007 equal US$ 15,599.80 (http://www.oanda.com/convert/classic), so that Claimant's legal fees and expenses have increased to a total of US$ 379,299.38.

94   Respondent did not challenge Claimant's cost statements and failed to file any claim with respect to its own costs. The Arbitral Tribunal considers Claimant's legal fees and expenses to be reasonable and assumes that Respondent does not request compensation.

95   Since Claimant shall bear 1/4 and Respondent 3/4 of the costs and expenses and Respondent does not claim compensation of costs, Respondent shall pay to Claimant 3/4 of the costs of the arbitration, including all fees, and 3/4 of Claimant's legal and other expenses as set forth in Claimant's statements of fees and expenses and in its post hearing submission.

(Rest of page intentionally left blank)

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

# FINAL AWARD

96   Based on the foregoing, the Arbitral Tribunal issues the following Final Award:

1.   Respondent shall pay to Claimant the principal of the two Loans in the total amount of 2,415,890,000 Russian Rubles.

2.   Respondent shall pay to Claimant interest on the Loans up to the day of this Final Award in the amount of 664,821,971 Russian Rubles.

3.   Respondent shall continue pay to Claimant post-award interest of 9% p.a. on the amount of 2,415,890,000 + 664,821,971 Russian Rubles as of the day of this Final Award up to the day of payment.

4.   All further claims are rejected.

5.   The Arbitration fees and costs, fixed by the ICC Court of Arbitration, are as follows:

| | |
|---|---|
| Administrative expenses ICC Court: | US$    88,800 |
| Fees of the Arbitrators: | US$   452,500 |
| Expenses incurred by the Arbitrators: | US$    38,700 |
| Total: | US$   580'000 |

Note: Since Claimant advanced US$ 680,000 to the ICC Secretariat, Claimant will be reimbursed by the ICC Secretariat US$ 100'000.

6.   Respondent shall bear 3/4 of the above arbitration fees and costs and Claimant 1/4. Since Claimant paid the total advance of cost to the ICC Court, Respondent shall compensate Claimant by an amount of US$ 435,000.

7.   Respondent shall carry 3/4 of Claimant's legal costs and expenses and shall reimburse Claimant in the amount of US$ 284,474.54.

8.   All payments in this Final Award are due immediately.

R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk

ICC No. 14203/EBS – Final Award                                   25 | 25

9.  This Final Award is effective upon signing by all three Arbitrators and communi-
    cation to the Parties by the ICC Court.


Place of Arbitration: New York City

*August 15, 2008*

THE ARBITRAL TRIBUNAL:

_____
Dr. Bernhard F. Meyer-Hauser


_____                    _____
John J. Kerr, Jr., Esq.                            Dr. Ivan Zykin


R. J. LOOSLEY
Notary Public
17 Hanover Square
LONDON
W1S 1HU
+44 020 7917 8500
rloosley@fasken.co.uk