```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 6, 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
YUKOS CAPITAL S.A.R.L.                        :
                                              :
                    Petitioner,               :     **10 Civ. 6147 (PAC)**
                                              :     **MEMORANDUM OPINION & ORDER**
        -against-                             :
                                              :
OAO SAMARANEFTEGAZ,                           :
                                              :
                    Respondent.               :
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

Yukos Capital S.A.R.L. ("Yukos Capital") seeks enforcement of an arbitration award issued in its favor against OAO Samaraneftegaz ("Samaraneftegaz") by the International Court of Arbitration of the International Chamber of Commerce ("ICC") in New York.  On September 25, 2012, the parties cross moved for summary judgment.  Samaraneftegaz argues that the Court should grant preclusive effect to a Russian court's refusal to enforce the award, and challenges the award on the grounds that it did not receive adequate notice of the arbitration proceeding, and that enforcement would violate domestic public policy.  For the reasons discussed below, the Court GRANTS summary judgment to Yukos Capital and DENIES Samaraneftegaz's motion for summary judgment.

## BACKGROUND

On July 24, 2012, the Court found that it had personal jurisdiction over Samaraneftegaz. See 2012 U.S. Dist. LEXIS 104702, 10 Civ. 6147 Dkt. No. 100 (S.D.N.Y. 2012).  The court assumes familiarity with the procedural history and the relevant facts as set forth in the Court's

1

previous order. Id. at 1-2 n.1, 3-5. Briefly summarized, and supplemented for the purposes of the parties' pending motions, the facts are:

Yukos Capital is a Luxembourg-based subsidiary of Yukos Oil Company ("Yukos Oil"). (Yukos Capital 56.1 ¶ 1.) Samaraneftegaz was also a wholly-owned subsidiary of Yukos Oil from 2001 until May 2007, when Neft-Aktiv acquired the shares of Samaraneftegaz at an auction. (Id. ¶¶ 5, 11.) Samaraneftegaz is now a subsidiary of OJSC Oil Company Rosneft, a Russian state-controlled oil company.

### A. The July 2004 Loan Agreements

In July 2004, Samaraneftegaz and Yukos Capital executed two loan agreements in which Yukos Capital extended a total of RUR 2,415,890,000 to Samaraneftegaz (the "Loans"). (Id. ¶ 12.) The addenda to the Loans submitted all relevant disputes to arbitration before the ICC. (Id. ¶ 17.) It is undisputed that Samaraneftegaz failed to make any payments on the Loans, including interest when due and principal upon notice of default. (Id. ¶¶ 18-20.)

### B. The Arbitration Proceedings

On January 12, 2006, Yukos Capital requested arbitration at the ICC to settle the outstanding Loans. (Id. ¶ 23.) The ICC notified Samaraneftegaz by letter dated January 20, 2006 that Yukos Capital had demanded arbitration, forwarded a copy of the Request for Arbitration, and reported that its Answer would be due within thirty days. (Id. ¶ 26.) The notice was sent to Samaraneftegaz's corporate address at 50 Volzhsky prospect, Samara, 443071, Russian Federation. (Id.) Throughout the initial stages of the arbitration, the ICC continued to send notices to this address.[1] Samaraneftegaz does not dispute its receipt of these notices:

- February 7, 2006 letter: the ICC reminded Samaraneftegaz that its Answer would be due on February 22. (Id. ¶ 27.)

---

[1] This was the address noted in Yukos Capital's demand for arbitration to the ICC. (Samaraneftegaz 56.1 ¶ 4(b).)

- February 15, 2006 letter: the ICC requested Samaraneftegaz's comments on Yukos Capital's proposal that the panel consist of a single arbitrator instead of three. (Id. ¶ 28.)
- February 28, 2006 letter: the ICC notified Samaraneftegaz that, since it failed to submit its Answer, Yukos Capital's Request would be submitted to the ICC Court to determine jurisdiction. The ICC also informed Samaraneftegaz that Yukos Capital nominated John Kerr as a co-arbitrator. (Id. ¶ 29.)
- March 13, 2006 letter: the ICC forwarded a copy of Kerr's acceptance, his statement of independence, and his CV. (Id. ¶ 30.)

Samaraneftegaz did not respond to any of these letters.

On April 6, 2006, ZAO Yukos Exploration and Production ("Yukos EP"), on behalf of Samaraneftegaz, informed the ICC that it would not bear any of the costs of the arbitration because it disputed the validity of the arbitration provisions. (Id. ¶ 31.) At the time, Yukos EP was Samaraneftegaz's management company by virtue of a delegation of powers agreement. (Id. ¶ 6.) Yukos EP's letterhead contained a mailing address and fax number different than Samaraneftegaz's corporate address. (Coyle Dec. Ex. 34.) On May 12, 2006, Yukos EP again contested the ICC's jurisdiction. (Yukos Capital 56.1 ¶ 38.) After the April 6, 2006 letter, with one notable exception discussed below, the ICC sent notices and a copy of the award to Yukos EP's fax number and mailing address, and stopped sending notices to Samaraneftegaz's corporate address.[2]

The exception occurred when the ICC sent a revised version of the Terms of Reference directly to Samaraneftegaz's corporate address on October 24, 2006. (Id. ¶ 51.) The letter was sent via registered mail against return receipt. It set forth the procedural history of the arbitration proceeding to date and identified Yukos EP as Samaraneftegaz's representative. (Coyle Dec. Ex.

---

[2] The ICC gave notices that it had overruled Samaraneftegaz's jurisdictional challenge; confirmed Kerr as co-arbitrator, appointed Dr. Ivan Zykin as a co-arbitrator on behalf of Samaraneftegaz; appointed a chairperson for the tribunal; set September 5, 2006 as the date for the Terms of Reference hearing; sent a draft of the Terms of Reference; set January 18, 2007 as the date of the evidentiary hearing in New York; approved the Terms of Reference, provided the schedule of the evidentiary hearing; and solicited a post-hearing brief from Yukos EP. (Id. ¶¶ 37, 39, 45, 47, 53, 55, 56, 57.)

51.) Samaraneftegaz did not sign the revised Terms.  In fact, Samaraneftegaz never filed any written or oral submissions on the merits.  (Id. Ex. 8, ¶ 19.)  In its August 15, 2007 award, the tribunal ordered Samaraneftegaz to pay Yukos Capital the outstanding RUR 2,415,980,000.00 due under the Loans, contractual interest in the amount of RUR 664,821,971.00, interest at a rate of 9% on the award until payment, $ 435,000 USD for arbitration fees and costs, and $ 284,474.54 USD for Yukos Capital's legal costs and expenses.  (Id. ¶ 96.)

### C. The Russian Enforcement and Neft-Aktiv Actions

In July 2007, more than a year after the commencement of arbitration, Neft-Aktiv, Samaraneftegaz's sole shareholder, sued Samaraneftegaz and Yukos Capital in Russian court in Samara to invalidate the Loans.  (Yukos Capital 56.1 ¶ 59.)  In its claim, Neft-Aktiv argued that the Loans were "sham transaction[s] intended to conceal the actual relations between the parties in the form of an illegal transfer [by] OJSC Samaraneftegaz of its funds in favor of Yukos Capital S.a.r.l. and subsequent return of the abovementioned amounts to OJSC Samaraneftegaz in the form of a loan."  (Carlisle Dec. Ex. C at 1; Samaraneftegaz 56.1 ¶ 8.)  Yukos Capital participated in the proceeding.  (Samaraneftegaz 56.1 ¶ 9.)  On July 28, 2009, the court adjourned the proceeding pending the criminal trial of Khodorkovsky and Lebedev, former executives of Yukos Oil, in connection with their misappropriation of funds from Yukos' subsidiaries, including Samaraneftegaz.  (Carlisle Dec. Ex. B at 2, 5.)[3]  Yukos Capital was not a party to this criminal proceeding.  (Yukos Capital Supp. 56.1 ¶ 7.)

On August 9, 2010, Yukos Capital filed a petition with the Arbitrazh court in Samara for enforcement of the arbitration award.  (Samaraneftegaz 56.1 ¶ 2.)  In its ruling issued on February 22, 2011, the court refused to enforce the award on the grounds that "Samaraneftegaz

---

[3] As noted in the text of the Neft-Aktiv opinion, the sentences of Khodorkovsky and Lebedev came into effect on December 27, 2010.  (Carlisle Dec. Ex. B at 5.)

was not given notice of the important stages of the progress of the [arbitration]." (Carlisle Dec. Ex. A at 5.) The court found that Samaraneftegaz did not receive any notices after March 13, 2006 because notice to Yukos EP was not notice to Samaraneftegaz. (Id. at 3-4.) The court also refused to enforce the award on the grounds that doing so would violate Russian public policy. (Id. at 7.)

On February 8, 2012, the Russian court in Samara issued a decision in Neft-Aktiv's favor, invalidating Yukos Capital's loans to Samaraneftegaz. (Samaraneftegaz 56.1 ¶¶ 8, 10.) Specifically, the court determined that "the loans advanced by Yukos Capital S.a.r.l. were financed from funds taken away earlier from OJSC Samaraneftegaz in the course of implementation of transfer pricing mechanisms." (Carlisle Dec. Ex. B at 4.) In reaching this conclusion, the court cited the sentence issued in connection with the Khodorkovsky and Lebedev convictions, and two civil tax cases against Yukos Oil. (Id. at 4-6.) Yukos Capital appealed this decision to the Eleventh Arbitrazh Court of Appeal, which affirmed the trial court's judgment on July 20, 2012. (Samaraneftegaz 56.1 ¶ 12.) Yukos Capital later unsuccessfully filed a cassation appeal. (See Carlisle Rep. Dec. Ex. F.) On July 8, 2013, the Supreme Arbitrazh Court denied supervisory review of the case, thus precluding further review in Russia.

## DISCUSSION

A court with jurisdiction "shall" confirm an award falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") unless there are statutory grounds for refusal of recognition. 9 U.S.C. § 207. The only two grounds that Samaraneftegaz identifies are: (1) that it "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present [its] case" (Article

5

V(1)(b)); and (2) "[t]he recognition or enforcement of the award would be contrary to the public policy of [the United States]" (Article V(2)(b)).

In opposing enforcement of the award, Samaraneftegaz bears the burden of proof, and the burden is a heavy one. Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 90 (2d Cir. 2005). As discussed earlier, Samaraneftegaz argues that the Court should refuse to enforce the ICC's arbitration award for two reasons: (1) Samaraneftegaz did not receive adequate notice of the arbitration at critical stages; and (2) the Court's enforcement of the award would violate U.S. public policy by condoning the tax evasion scheme that Yukos Capital is alleged to have effectuated through the underlying loans.

### I. Samaraneftegaz's Notice Under U.S. Due Process Standards

First, Samaraneftegaz argues that the Court should apply the doctrine of collateral estoppel to the arbitrazh court's determinations that Samaraneftegaz did not receive specific notices. Collateral Estoppel

> applies when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 400 (2d Cir. 2011) (quotation omitted). Issue preclusion applies to judgments issued by courts of foreign countries. Alfadda v. Fenn, 966 F. Supp. 1317, 1325 (S.D.N.Y. 1997). Recognition of the judgments of foreign courts, however, is not a matter of obligation, but comity. Gordon & Breach Science Publrs. S.A. v. Am. Inst. of Physics, 905 F. Supp. 169, 178-79 (S.D.N.Y. 1995). "The decision to grant comity is a matter within a court's discretion and the burden of proof to establish its appropriateness is on the moving party." Maersk, Inc. v. Neewra, Inc., 2010 U.S. Dist. LEXIS 69863, at *29 (S.D.N.Y. July 9, 2010) (quotation omitted).

Samaraneftegaz does not contend that the Court should defer to the Arbitrazh court's legal conclusion that the notice was inadequate because, as Samaraneftegaz acknowledges, "the ultimate issue of the adequacy of notice was governed by Russian law in the prior action and by U.S. law here." (D. Rep. at 1-2.) Instead, Samaraneftegaz relies on collateral estoppel to bar Yukos Capital from re-litigating Samaraneftegaz's receipt of certain notices. The Court exercises its discretion in declining to grant such findings any preclusive effect. First, Samaraneftegaz does not dispute in this proceeding that it received all of the ICC's notices up until and including the March 13, 2006 letter. (Yukos Capital 56.1 ¶¶ 26-30.) Similarly, Samaraneftegaz does not dispute its receipt of the October 24, 2006 Terms of Reference. (Id. ¶ 51.) Since these facts are not at issue, there is no need to defer to the Arbitrazh court on the subject. Even if Samaraneftegaz were to dispute receiving these notices, collateral estoppel would be inappropriate as it is unclear that the Arbitrazh court actually decided the issue. The Arbitrazh court's opinion neglected to mention the October 24, 2006 notice entirely, and the only reference to the notices dated March 13, 2006 and earlier was that "[t]he materials of this case . . . do not contain any actual evidence (DHL receipts) that those notices have been sent to [Samaraneftegaz's] address." (Carlisle Dec. Ex. A at 3.)

As for the remaining notices, the Court finds that there is insufficient identity of issues to support collateral estoppel. See Peterson v. Clark Leasing Corp., 451 F.2d 1291, 1292 (9th Cir. 1971) (per curiam) ("Issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits be the same."). Despite Samaraneftegaz's assurances that it does not seek preclusive effect with respect to any legal conclusions, the Arbitrazh court's determinations were not strictly findings of fact. Rather, its decision that Samaraneftegaz did not "receive" notice, including through Yukos EP, is based at

least to some extent on its application of Russian law.  By contrast, this case is governed by a different legal standard—the inquiry is whether the steps taken to apprise Samaraneftegaz of the proceedings comport with domestic due process standards.  The Court also notes that deference to the Arbitrazh court's findings on the narrow question of Samaraneftegaz's receipt of certain notices would not promote judicial economy, as this Court can readily determine the issue for itself from the record, and these factual issues are intertwined with the due process analysis that the Court must independently conduct.  See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979) (describing as one of collateral estoppel's dual purposes "promoting judicial economy by preventing needless litigation.").[4]

To establish lack of notice as a defense to enforcement under Article V(1)(b) of the Convention, the party challenging the award must show that the arbitration procedures failed to comport with this country's standards of due process.  Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier, 508 F.2d 969, 975 (2d Cir. 1974).  Under U.S. law, "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Iran Aircraft Indus. v. Avco Corp., 980 F.2d 141, 146 (2d Cir. 1992) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).  Samaraneftegaz's claim of lack of notice does not amount to a due process violation.

It is significant that Samaraneftegaz decided not to participate in the arbitration with full knowledge of its existence after having received five separate notices of its initiation.  Indeed, Samaraneftegaz does not dispute that the ICC gave notice on January 20, 2006 that it was named as a respondent in the arbitration, and the letter was properly sent to Samaraneftegaz's corporate

---

[4] Samaraneftegaz also urges that preclusive effect be given to the findings in the Neft-Aktiv action. As discussed below, Samaraneftegaz has forfeited the opportunity to litigate the validity of the Loans, and has additionally failed to identify a well-defined, dominant public policy that would require the refusal of recognition in this case. Accordingly, the Court need not address the preclusive effect of the Neft-Aktiv findings.

address in Samara. (Yukos Capital 56.1 ¶ 26.) Samaraneftegaz also admits that it received further ICC notices dated February 7, 2006, February 15, 2006, February 28, 2006, and March 13, 2006, apprising it of the due date of its answer, soliciting comments on the proposal to use a sole arbitrator rather than a panel, and informing it of Yukos Capital's nomination of another co-arbitrator. (Yukos Capital 56.1 ¶¶ 27-30.) Aside from notices of the commencement of proceedings, Samaraneftegaz also does not contest that it received the Chairman's letter, dated October 24, 2006, containing the revised Terms of Reference, which was also mailed to its corporate address in Samara. (Id. ¶ 51.) The letter informed Samaraneftegaz that it was being represented by Yukos EP, reported Grekhov and Starodubtsev's jurisdictional challenges on behalf of Samaraneftegaz, summarized the parties' positions, outlined the issues to be determined, catalogued the procedural history of the arbitration to date, including notice that the ICC Court confirmed John Kerr as co-arbitrator, appointed Dr. Ivan Zykin as a co-arbitrator, and appointed Dr. Bernhard F. Meyer-Hauser as Chairman. (Yukos Cap. Ex. 51 at YC326-YC334.) The notice also reported that the Terms of Reference hearing date was September 5, 2006. (Id. at YC330.)

If, as Samaraneftegaz contends, it did not receive notice of any developments in the arbitration proceeding after March 13, 2006, at the very least, the October 24, 2006 letter would have alerted it to the fact that the arbitration was proceeding in its absence, and Samaraneftegaz could have informed the ICC that it was not receiving communications or otherwise availed itself of the opportunity to participate.[5] These facts support a conclusion that Samaraneftegaz's absence was due to a decision not to appear, rather than lack of notice. See Bernstein Seawell & Kove v. Bosarge, 813 F.2d 726, 729 (5th Cir. 1987) ("[D]ue process is not violated if the hearing

---

[5] For instance, Samaraneftegaz could have petitioned to be heard on the Terms of Reference, which had not yet been approved by the ICC Court, and asked for the date of the evidentiary hearing.

proceeds in the absence of one of the parties when the party's absence is the result of his decision not to attend."); Geotech Lizenz AG v. Evergreen Sys., Inc., 697 F. Supp. 1248, 1253 (E.D.N.Y. 1988) (finding that notice complied with due process where the "[respondent's] failure to participate was a decision that was reached only after the Company had full knowledge of the peril which it acted."). Since the record does not contain any evidence that Samaraneftegaz attempted to submit any briefing or otherwise be heard after receiving notice that the arbitration was proceeding in its absence, the Court cannot conclude that Samaraneftegaz was prohibited from presenting its case or denied the opportunity to be heard at a meaningful time and in a meaningful manner.[6]

In any event, there has been no due process violation when the notices were reasonably calculated to inform Samaraneftegaz of the proceeding and provided Samaraneftegaz an opportunity to be heard. See Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950). Due process does not require perfect or actual notice.[7] After sending notices directly to Samaraneftegaz's headquarters informing it of the pendency of the arbitration, the ICC reasonably started to direct its correspondence to Yukos EP, as the only entity from whom it ever

---

[6] Samaraneftegaz argues that due process requires that "adequate notice be provided at each significant stage in the arbitral process." (Samaraneftegaz Mot. at 12.) At oral argument, Samaraneftegaz emphasized two cases to this effect. (Hr'g Tr. 27:6-18.) The cases cited, however, do not go as far as Samaraneftegaz suggests. In Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc., 2005 U.S. Dist. Lexis 8810, at *30 (D. Kan. May 10, 2005), the court noted the lack of proof that the respondent received notice beyond that of the proceeding itself. That is not equivalent to requiring notice at "each significant stage" of the arbitration, and in any event Samaraneftegaz does not dispute that it received the arbitrators' initial letters and the October 24, 2006 revised terms of reference, which set forth much of the information noted as possibly absent in Guang Dong. Similarly, in Qingdao Free Trade Zone Genius Int'l Trading Co., Ltd. v. P & S Int'l Inc., 2009 U.S. Dist. LEXIS 85949, *11-12 (D. Or. Sept. 16, 2009), the court declined to enforce an award where the notices did not sufficiently alert respondent to petitioner's demand for arbitration. By contrast, Samaraneftegaz does not dispute that it knew that Yukos Capital had initiated arbitration.
[7] As the Supreme Court noted in Mullane: "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance. But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied." Id. (citations omitted).

received a response in the arbitral proceeding.  The ICC reasonably believed that Yukos EP was Samaraneftegaz's representative: in the April 6 letter, Grekhov, the President of Yukos EP, described Yukos EP as Samaraneftegaz's management company, acknowledged receipt of an earlier letter in the matter, and asserted a defense on behalf of Samaraneftegaz.  (Coyle Dec. Ex. 34.)  Yukos EP was in contact again on May 12, 2006, through its new acting president, Y.S. Starodubtsev, who reasserted Samaraneftegaz's jurisdictional defense.  (Coyle Dec. Ex. 38.) After the ICC sent the revised Terms of Reference directly to Samaraneftegaz's headquarters alerting it to the fact that the tribunal had deemed Yukos EP to be its representative, it did not receive any response disputing the position that Yukos EP was its representative or stating that it did not receive prior notices.  This is not the case where the ICC stopped sending notices entirely after learning that Samaraneftegaz did not wish to appear in proceedings—it continued sending notices to an entity that it reasonably believed represented Samaraneftegaz.  Nor does Samaraneftegaz's change in management companies to Yukos Refining and Marketing ("Yukos RM") in June, 2006 render the ICC's continued notices to Yukos EP unreasonable.  It was Samaraneftegaz's responsibility to inform the ICC of any changes to its choice of representative, see ICC Rules Art. 3(2), and not the duty of the ICC to keep abreast of such changes.

Samaraneftegaz argues that another reason that notice was inadequate is that the ICC's notes were in English, and not a single person at Samaraneftegaz spoke enough English to understand the notices.  This is unpersuasive since Samaraneftegaz had already consented to arbitrate in English.  (Coyle Dec. Exs. 18 ¶ 1; 19 ¶ 1.)  Samaraneftegaz concedes that it knew that Yukos Capital had commenced arbitral proceedings.  (Hr'g Tr. at 27:25-28:6.)  If there were truly an issue of comprehension, the onus rested on Samaraneftegaz to secure a translation.  The Court

11

holds that Samaraneftegaz has failed to satisfy its burden to demonstrate the proceedings were conducted in violation of U.S. due process standards.

## II. Public Policy

Samaraneftegaz argues that the Court's enforcement of the ICC's award would give effect to Russian tax fraud since the Loans were a mechanism to return Samaraneftegaz's own funds that were part of Yukos Capital's tax evasion scheme. The Court disagrees.

### a. Samaraneftegaz Cannot (Re-)Litigate the Legality of the Loans

A court's review of an arbitral award is limited, and in this context, does not extend to the validity of the Loan agreements. In Buckeye Check Cashing, Inc. v. Cardegna et al., 546 U.S. 440, 449 (2006), the Supreme Court held that issues relating to the contract's validity as a whole, as distinguished from the arbitration agreement in particular, are matters for the arbitrator to consider in the first instance. See also Rent-a-Center, W., Inc. v. Jackson, 130 S. Ct. 2772, 2778-79 (2010). Since the Court has already determined that the arbitration addenda are valid, the legality of the Loans is a matter appropriate for arbitration. It is not the court's role in reviewing an award to find facts or draw inferences for itself in the first instance. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 45 (1987) ("Nor does the fact that [the court] is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task."). Samaraneftegaz counters that it cannot be precluded by any findings in the award because it was denied the opportunity to dispute the validity of the Loans. That argument, as explained earlier, is meritless as Samaraneftegaz had adequate notice of the proceedings. Samaraneftegaz also argues that the arbitrators never found that the underlying loans were valid, and merely assumed in error that their validity was undisputed. (Samaraneftegaz Rep. at 9; Carlisle Dec. Ex. 8 ¶ 55.) The Second Circuit is clear, however, that whether or not the issues were actually litigated in the

arbitration proceeding is immaterial, if they were required to be arbitrated. Europcar Italia, S.P.A. v. Maiellano Tours, 156 F.3d 310, 315 (2d Cir. 1998). Samaraneftegaz's failure to contest the validity of the Loans before the ICC is a result of its own choice; it cannot now rely on its own omissions to support a public policy defense. Samaraneftegaz was bound by a valid arbitration clause to contest this issue before the arbitrators. Instead of doing so, its sole shareholder initiated a collateral proceeding in Russia while the arbitration was pending to litigate the same issue in a transparent attempt to circumvent a forum that it considered unfavorable. To refuse to enforce a valid award in these circumstances would run counter to the strong public policy in favor of arbitration. See Telnor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 410-11 (2d Cir. 2009). The Court exercises its discretion in declining to credit Samaraneftegaz's belated public policy arguments. See International Commercial Arbitration: A Guide for U.S. Judges, Federal Judicial Center (2013) at 72 ("[N]on-enforcement is discretionary rather than mandatory.").

### b. Samarneftegaz Has Not Identified a Cognizable Public Policy

Even if the Court were to consider the substance of Samaraneftegaz's defense, Samaraneftegaz has failed to identify a well-defined and dominant public policy. As with any defense to recognition of the arbitral award, Samaraneftegaz bears a heavy burden of proof. Encyclopaedia Universalis S.A., 403 F.3d at 90. The Second Circuit has cautioned that the public policy defense in particular "must be construed very narrowly to encompass only those circumstances where enforcement would violate our most basic notions of morality and justice." Telnor Mobile Communs, 584 F.3d at 396 (internal quotation marks omitted); see also Parsons & Whittemore Overseas Co., 508 F.2d at 973.

Public policy must be "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." United Paperworkers Int'l Union, 484 U.S. at 43 (internal quotation marks omitted). Samaraneftegaz cites several sources purportedly identifying a U.S. public policy against foreign tax evasion. First, it relies on U.S. statutes that criminalize tax evasion (26 U.S.C. §§ 7201-12, 7268, 7270, and 7275), money laundering (18 U.S.C. §§ 1956-57), conspiracies to defraud the United States (18 U.S.C. § 371), and set penalties on transfer pricing (26 U.S.C. §§ 482, 6662). (Samaraneftegaz Mot. at 16.) These provisions miss the mark; while they may evidence a public policy against violating domestic tax laws, they say nothing of the United States' role in policing claims of foreign tax fraud.

Samaraneftegaz also points out that the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, criminalize conduct directed at defrauding foreign governments. (Samaraneftegaz Mot. at 16 (citing Pasquantino v. United States, 544 U.S. 349 (2005).) Pasquantino cannot fairly be read to state a well-defined and dominant public policy. In that case, the Supreme Court condemned a plot that involved smuggling liquor into Canada because the conduct fell within the plain terms of the wire fraud statute, and the Court refused to create a specific exception for frauds directed at evading foreign taxes. Id. at 358 ("[T]he wire fraud statute punishes fraudulent use of domestic wires, whether or not such conduct . . . evades foreign taxes."). The Second Circuit, in holding that a scheme to defraud Canada of tax revenue was cognizable under the wire fraud statute, noted that its concern extended only to "what has been expressly forbidden by statute—the use of the wires in the scheme to defraud," not with "[w]hether our decision . . . indirectly assists our Canadian neighbors . . . in the collection of taxes . . . ." United States v. Trapilo, 130 F.3d 547, 553 (2d Cir. 1997). The fact that a scheme is not excluded from the reach of a statute

is not evidence that it offends the most basic notions of morality and justice so as form the basis of domestic public policy.

Third, Samaraneftegaz relies on a tax treaty between the U.S. and Russia—the Convention Between the United States of America and the Russian Federation for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income and Capital, U.S.-Rus., June 17, 1992, S. Treaty Doc. No. 102-39, and cases supporting the IRS' authority to issue summons in aid of foreign tax investigations. Yet Samaraneftegaz cites no provision of the treaty that calls the United States to enforce Russian tax laws against non-citizens in any context other than double-taxation. Any efforts to cooperate with foreign authorities through information exchange may support a general public interest but do not rise to the level of representing public policy. See United Paperworkers Int'l Union, 484 U.S. at 43.[8] In light of the Second Circuit's admonition that Article V(2)(b) must be "construed very narrowly," Europcar Italia S.p.A, 156 F.3d at 315, the Court declines to refuse recognition on this basis.[9]

## CONCLUSION

For the reasons discussed above, the Court GRANTS Yukos Capital's motion for summary judgment and DENIES Saramaneftegaz's motion for summary judgment. The Clerk of

---

[8] While the defense is frequently invoked, it is rarely successful. Agility Pub. Warehousing Co. K.S.C. v. Supreme Foodserv. GMBH, 495 Fed. Appx. 149, 151, 2012 U.S. App. Lexis 18698 (2d Cir. September 6, 2012). The cases that Samaraneftegaz cites can be distinguished or are inapposite. In Sea Dragon, Inc. v. Gebr. Van Weelde Scheepvaartkantoor B.V., 574 F. Supp. 367, 372 (S.D.N.Y. 1983), the court found that the arbitrators directed the violation of a Dutch sequestration decree. The Neft-Aktiv decision was not rendered until after the arbitral award, and Samaraneftegaz does not contend that the award disregarded the law at the time it was decided. Unlike the respondent in Changzhou AMEC E. Tools & Equip. CP. LTD v. E. Tools & Equip. Inc., 2012 U.S. Dist LEXIS 106967, 2012 WL 3106620 (C.D. Cal. July 30, 2012), Samaraneftegaz does not contend that it signed the loan agreements under duress. In Laminoirs-Trefileries-Cableries de Lens, S.A. v. Southwire Co., 484 F. Supp. 1063. 1069 (N.D. Ga. 1980), the court declined to enforce an award that adopted a penal rather than compensatory interest rate. Unlike here, the public policy in that case was a well-defined and specific principle expressed in case law. Samaraneftegaz cites other cases in which courts have refused to enforce private contracts that contravened public policy, but those cases were not proceedings to recognize and enforce arbitration awards, and fail to account for the strong federal policy favoring arbitration.

[9] Having found that the public policy defense does not apply, the Court does not consider whether, as Yukos Capital contends, the revenue rule would bar such a defense.

Court is directed to terminate the motions at docket numbers 105 and 109.

Dated: New York, New York
       August 6, 2013

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge